dissen tiente.
 
 — Evans, Andrews, Runyon and William Ellison, associated themselves together as merchants and partners in trade. The firm had two branches; one at Washington, the books of which were kept in the style and name of “
 
 Runyon, Ellison & Co.”
 
 and William Ellison was the acting partner. The other branch was established at Sparta in Edgecombe county, the books of which were in the style and name of “ Evans Andrews & Co.,” and was managed by Evans and Andrews.
 
 *308
 
 The firm shipped large quantities of produce to the care and management of
 
 Van Bokkelin and While,
 
 commission-merchants of New York. William Ellison and James Ellison, were largely indebted to Van Bokkelin. Runyon had undertaken, with James Ellison, to pay his part of the debt. William Ellison (for the purpose of discharging this separate debí, which was due only from himself and Runyon,) drew a bill of exchange in the name of the firm, on
 
 Van Bokkelin and While,
 
 in favour of
 
 Van Bokkelin.
 
 The bill was accepted by the drawees, and the avails passed to
 
 Van Bokkelin,
 
 in discharge of the separate debt. In taking the accounts between the firm in North Carolina, composed of the fdur members first named, and the firm of
 
 Van Bokkelin and White,
 
 the question is, whether
 
 Van Bokkelin and White
 
 are entitled to a credit for the amount of this bill of exchange? Much testimony has been offered by the plaintiffs, for the purpose of proving that
 
 Evans
 
 and
 
 Andrews
 
 knew of the bill being drawn in the name of the firm,-and to be applied as it was applied; or that the debts of William and James Ellison were assumed by the new firm on its first formation. But there is nothing that satisfies my mind, that those debts were assumed by the new firm, or that JEuiZiis and
 
 Andrews
 
 knew of, or author-ised, or at any time assented to the transaction. The letter of Evans to Van Bokkelin, that “
 
 they had joined stocks with William Ellison ”
 
 furnishes no proof that the new firm were to be responsible for the separate debts of William and James Ellison, or for the price of stock brought by the separate partners into the firm; Gow, 168; and Van Bokkelin did not so understand the letter. He refused to discharge James Ellison from liability until after much persuasion by James Ellison, and after a long time had elapsed. The proof that Evans once went to Washington, and was seen looking into the books, at that place, of
 
 Runyon, Ellison Sp Co.,
 
 wherein William Ellison had charged himself to the firm, with several small bills, drawn in the name of the firm on Van Bokkelin and White, to pay his separate debts in New York, is not sufficient to fix Evans with notice. (William Ellison had also charged himself and Runyon with this bill, on the day-book of the
 
 *309
 
 firm at Washington.) There is no evidence that these entries in the books at Washington ever caught the eye of Evans. If Evans had been an acting partner at Washington, a presumption would arise from the entry in the books, that he had notice of them; and his silence would have been evidence of acquiescence in the transaction. But the position of Evans, although a partner, repels the presumption of notice to him by the entries béing in the books at Washington. Out of the mass of evidence, there is not a tittle that goes to prove that Evans.knew of, or sanctioned the transaction. The letter in which he says that
 
 “they had joined stocks,”
 
 and the entry of'the bill in the books of
 
 “Runyon, Ellison Co.”
 
 does not' in my mind, fix Evans with .liability. The case then comes to this, in taking the accounts, can
 
 Van Bokkeiin and White
 
 have a credit for this bill of exchange? Is not the burthen of proof upon them
 
 to
 
 show to the Court, that Evans and Andrews had notice, and sanctioned or authorised William Ellison to draw the bill for the payment of his separate debt ? The power of one partner, to bind the firm, as to all the partnership concerns, has never been disputed. It is in the scope of a trading partner’s general authority so to act, without the creditors inquiring whether the particular partner had such an authority expressly delegated .to him. Gow. 54. But for one partner to draw bills, &c. in the name of the firm to pay his separate debt, is beyond his implied authority. A series of decisions have shown, that if a separate creditor of a partner take a partnership security towards the discharge of his separate debt,
 
 that fact alone,
 
 unless explained by particular circumstances, is conclusive evidence to charge the creditor with fraud, or with gross negligence amounting to fraud, and consequently that the firm is not bound by such transaction. Collyer on Partnership, 280. This author has arranged the authorities which were cited by counsel, in the argument of the case now under consideration. In
 
 Hope
 
 v.
 
 Cust,
 
 1 East, 53, where a partner had given the guaranty of the firm, as a security for his separate debt, Lord Mansfield directed the jury to inquire,
 
 first,
 
 whether there was not positive fraud; or
 
 secondly,
 
 whether there was not gross
 
 *310
 
 negligence amounting to fraud, on the part of the creditor ; and in either case, to find a verdict, against him. The facts were these: Fordyce, who traded very largely in his separate capacity with
 
 Hope
 
 &
 
 Co.
 
 in Holland, did, for, and in the name of himself and partners, give them a general guaranty for the money due from him in his separate capacity. Fordyce became a bankrupt, and after-wards all the partners became bankrupts. And a bill was filed in the Court of Chancery by
 
 Hope
 
 & Co., in order to have the benefit of this guaranty -, the Court directed an issue to try the validity of it. There was strong presumptive proof that the partners of Fordyce had no privity in the transaction. Lord Mansfield, in summing up the evidence to the jury, said, — “ There is no doubt, but that the act of every, single partner in a transaction relating to the partnership, binds all the others. But there is no general rule, which may not be infected by covin, or such gross negligence, as may amount to, or be equivalent to covin; therefore the whole will turn on this, whether the taking the guaranty from Fordyce himself, in his own handwriting, without consulting the other partners, or having their privity, is not such gross negligence in the
 
 Hopes
 
 as will amount to a fraud or covin. Fordyce was acting in two several capacities, having transactions in his own name only, for his own separate benefit; and in the names of the partnership, for his own benefit. It is manifest that
 
 Hope
 
 &
 
 Co.
 
 trusted to it as binding on the partnership. Therefore this brings it to the question, whether it be not a gross negligence? especially as they knew at the time, that Fordyce was acting in his separate capacity ; and this security was intended to indemnify them against his separate debts.” The jury found a verdict for the defendant. Lord Mansfield, in his report to the Court of Chancery, on a motion for a new trial, said: “ that three things were established to the satisfaction of himself and the jury.
 
 First,
 
 that the transactions between Hope & Co. and For-dyce were wholly on Fordyce’s account.
 
 Secondly,
 
 that the partners of Fordyce derived no profit or benefit whatever from them.
 
 Thirdly,
 
 that they had no notice of the guaranty, and consequently did not acquiesce in it. He
 
 *311
 
 said he left it to the jury whether under these circumstances, the taking of the guaranty was, in respect to the partners a fair transaction or covinous.” The case of
 
 Shirreff
 
 v.
 
 Wilkes,
 
 1 East, 48, was decided upon the same principles. “ This is an action” said Lord Kenyon, “ brought against three persons, Wilkes, Bishop and Robson, as acceptors of a bill of exchange. It appears that the acceptance was, in fact, made by Bishop alone, in the name of the firm. The consideration of this bill was some porter, which had been sold by the plaintiff to Wilkes and Bishop only, at a time when Robson had no concern with the house. Then the plaintiff, knowing this, drew the bill upon all the three partners, and knowingly took an acceptance from one of them to bind the other two, one of whom, Robson, had no concern with the matter, and was no debtor of theirs; no assent of his being found, and nothing stated to show that he had any knowledge of the transaction. It would be carrying the liability of partners for each other’s acts to a most unjust extent, if we suffered a new partner to be bound in this manner for an old debt, incurred by other persons.” The doctrine contained in these cases, has, if possible, been carried still further in more modern decisions. Thus, in the case of
 
 Green
 
 v.
 
 Deakin,
 
 2 Stark. Rep. 347, A. advanced to B. five hundred pounds, to enable him to enter into partnership with C. B. repaid to A. part of the sum advanced ; but being pressed to pay the remainder, he drew a bill in the partnership name, payable to A. and indorsed to A., without informing him that it was done without the concurrence of his partner C. In an action on the bill by A. against B. and C., B. having pleaded his bankruptcy, C. insisted that he was not bound by the transaction between A. and B., which he alleged to be a fraud. Lord Ellenborough was of that opinion, and nonsuited the plaintiff. Again,
 
 Ex parte Goulding,
 
 2 Glyn & Jameson, 118. Collyer, 283. 0‘Niel and Martin were partners. Goulding sold and delivered to 0‘Niel on his separate account, a cargo of timber. The agent of O’Niel, to whom the timber was delivered, drew a bill of exchange on O’Niel & Co. payable to the order of the drawer four months after date, and
 
 *312
 
 it was indorsed by the drawer to Goulding, in payment of the separate debt. Goulding left the bill on the day he received it, at the counting house of O’Neil & Co.; some hours afterwards, he called and received the bill, accepted in the name of the firm. Goulding admitted the acceptance was in the handwriting of'O’Niel, but he denied that there was any previous agreement that it should be accepted by O’Niel, or that there was any collusion with O’Niel in the matter. Upon this evidence, Sir John Leach dismissed the petition of Goulding, .to be admitted as a joint-creditor against the estate of O’Niel & Co. And upon appeal, the decision was affirmed by Lord Lyndhurst, who said, “ if the fact of Martin’s ignorance was known by Goulding, he can have no claim on the joint estate.
 
 The responsibility of ascertaining that fact rested on Goulding.”
 
 In
 
 Ex parte Bonbonus,
 
 8 Ves. 540, Lord Eldon remarked upon the necessity of the allegation in the petition, that the several transactions relative to the debt, took place without the privity or knowledge of Parnell. He said that he agreed with Lord Kenyon, that as partners do not act with good faith, when pledging the partnership property for the debt of the individual, so it is a
 
 fraud
 
 in the person taking that pledge for his separate debt. I think it is clearly to be seen and collected from the above British authorities, that Van Bokkelin cannot exonerate himself from the charge of gross negligence, which in law, is tantamount to being covinous, if Evans and Andrews were ignorant of the transaction ofEllison’s drawing the bill in the name of the firm. As Lord Lyndhurst said, in
 
 Ex parte Goulding,
 
 the responsibility of ascertaining that fact, rested on Van Bokkelin. This is agreeable to principle. By entering into partnership each party reposes confidence in the other, and constitutes him his general agent as to all partnership concerns, but in nothing else. Therefore if he acts beyond the scope of his general authority, and attempts to bind the firm in matters not relating to the partnership, he, who wishes to take advantage of such transaction, must show a new and extraordinary authority ; an authority separate and distinct from his general authority as partner, or the firm will not be
 
 *313
 
 bound. Such new authority is implied, if the other partners, have notice, and are silent on the subject. The rule laid down in the American decisions, is very explicit. In
 
 Chazournees
 
 v.
 
 Edwards,
 
 2 Pick. Rep. 5, (a case well argued,) Paheer, C. J. said, the principle has been very distinctly settled in many cases in the English and New York Reports, that a note or other security given in the name of a mercantile firm, by one of the house, to pay or secure a private debt of his own, without the knowledge or consent of his partners, cannot be recovered against the house. It is so laid down in Bailey on Bills, (4ed.) 47, and the cases cited in support of the position are numerous and decisive. The rule is summed up in these words, and repeated in every case, “ where a note is given in the name of a firm, by one of the partners, for the private debt of such partner, and known to be so by the person taking the note, the other partners are not bound by such note, unless they have been previously consulted and consent to the transaction.” The same doctrine is laid down in
 
 Doe
 
 v.
 
 Halsey,
 
 16 John. Rep. 34.
 
 Fool
 
 v.
 
 Sabin,
 
 19 John. Rep. 154.
 
 Brown
 
 v.
 
 Duncannon,
 
 4 Har. & M‘Henry, 350.
 
 Livingston
 
 v.
 
 Hastie,
 
 2 Cains’ Rep. 246, and
 
 vide Jones
 
 v.
 
 Yates,
 
 9 Barn. & Cres. 532.
 
 Heath
 
 v.
 
 Sanson,
 
 2 B. & Ald. 291. It seems to me, that the law is decidedly against the plaintiffs’ claim upon this bill, so far as to charge the firm of Evans and Andrews with the amount of it. Nothing can authorise Yan Bokkelin, or his assignees, to recover the amount of this bill against the firm, unless he or they show to the Court, that Evans and Andrews had notice that Ellison had drawn. The
 
 onus
 
 lies on the plaintiffs to make the proof, or they cannot recover, in my opinion, let the impressions on Van Bokkelin’s mind be what they may.
 

 Pee Curiam. Decree Accordingly.